2017 JAN 17 AM 10: 2



IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | ) |
| | ) No. 74449-6-I |
| Respondent, | ) |
| | ) DIVISION ONE |
| v. | ) |
| | ) |
| NICHOLAS RYAN COOK, | ) UNPUBLISHED OPINION |
| | ) |
| Appellant, | ) FILED: January 17, 2017 |
| | ) |
| HOLLY ANN BURKHART, and | ) |
| each of them, | ) |
| | ) |
| Defendant. | ) |

BECKER, J. — Nicholas Cook appeals his conviction for one count of residential burglary. He contends that he was denied effective assistance of counsel when defense counsel failed to object to evidence that he was a suspect in unrelated uncharged offenses. But the challenged comments were brief and isolated and did not clearly identify Cook's relationship to any prior offenses. Counsel's failure to object was therefore a reasonable trial strategy and did not constitute deficient performance. We affirm.

FACTS

Kelly Szabo lives in the Richmond Beach area of Shoreline. At about 11:30 a.m. on March 18, 2015, Szabo dropped off lunch for her child at nearby Syre Elementary School. Syre Elementary is located in a residential area near

12th Avenue NW and NW 196th Street. The school is on a dead-end street that is accessible only through "side roads."[1]

As she left the school, Szabo noticed a white Buick with license number ANK7245 parked near the school on 12th Avenue, just north of NW 196th Street. One person was inside the car. Based on "prior information"[2] about the Buick, Szabo called 911.

Szabo had seen the same car on March 7 and followed it to a house in nearby Woodway. When Szabo drove past the house again on March 17, she noticed a red pickup truck with license number B06608S parked outside.

Grant Bordon and his fiancée Gail Erickson live on 12th Avenue NW, two houses south of Syre Elementary. On March 18, 2015, both Bordon and Erickson left their house for work by 8:30 a.m. Bordon believed that the couple left the door from the rear deck to the kitchen unlocked.

When Bordon returned to the house around 1:30 p.m. and opened the garage door, he was surprised to find some of the parties' possessions, including suitcases filled with property, a television, and other "boxes of stuff,"[3] piled up near the garage door. After entering the house, Bordon found that the house had been ransacked:

---

[1] Report of Proceedings at 282.
[2] Report of Proceedings at 283.
[3] Report of Proceedings at 355.

the doors were open, the living room . . . we have a big violin oboe, whatever it is, but anyway, it was staged to go out the front door. There was boxes. There was a big container with a lot of my mom's stuff in it by the backdoor. Went upstairs, all the drawers had been pulled open and, you know, things were on the bed, on the floors. So each room had been gone through.[4]

Bordon called 911.

King County Sheriff's officers responded to Szabo's 911 call at about 11:45 a.m. After speaking briefly with the officers about the white Buick, Szabo left to take lunch to one of her other children at a different school. The officers were aware that Holly Burkhart, Burkhart's boyfriend Nicholas Cook, and Cook's brother Randolph were "associated"[5] with the white Buick.

When Detective Mark Souza arrived, Sergeant Richard Connelly was speaking with Dane Sullivan, the driver of the Buick. The Buick was parked facing south toward the Bordon/Erickson residence. Sullivan told Souza that he had "dropped some friends off"[6] in the area. Connolly was holding Sullivan's cell phone, which was "blowing up, ringing constantly."[7] The phone identified Holly Burkhart as the caller.

After delivering another lunch, Szabo returned to Syre Elementary at around 12:15 p.m. While speaking with Detective Eric Soderstrom, Szabo saw

---

[4] Report of Proceedings at 339.
[5] Report of Proceedings at 320.
[6] Report of Proceedings at 313.
[7] Report of Proceedings at 320.

the red pickup truck with license number B06608S drive down the hill on NW 196th Street. The truck then turned north onto 12th Avenue NW and sped past the officers. After Szabo directed his attention to the truck, Soderstrom directed other deputies to stop the truck.

As officers began their pursuit, Anthony Birchman was working at a nearby house. Birchman noticed a red truck drive by going "pretty fast for the area."[8] Birchman watched as the passenger door of the truck opened and a man jumped out. The man, who lost his baseball cap as he jumped, crouched behind a nearby parked car and bush. A short time later, a patrol car pulled up nearby. When the officer stepped out of the patrol car, the man opened a gate and ran into a backyard. Birchman showed the officer where the man had fled.

Detective Souza pursued the red truck as it turned off 12th Avenue NW and drove uphill on NW 199th Street. Part way up the block, Souza stopped behind Sergeant Connelly, who was standing outside his patrol car. Connelly had his pistol drawn and was "yelling commands."[9] Connelly directed Souza to the backyard of a nearby house, where Souza found Cook lying on the ground. Cook had fresh scratches on his arm and was "breathing really, really hard, kind of sweating profusely, and his heart was racing."[10]

---

[8] Report of Proceedings at 301.
[9] Report of Proceedings at 326.
[10] Report of Proceedings at 328-29.

Officers stopped the red truck near the corner of NW 199th and 11th Avenue NW, a short distance from where Cook had jumped out. Randolph Cook was driving; Holly Burkhart was in the rear compartment of the truck's cab.

After obtaining a search warrant, Deputy Coby Coblantz searched the Buick and the truck. Coblantz found a black backpack on the front passenger floorboard of the truck. The backpack contained some of Erickson's jewelry, prescription medication with Erickson's name on it, and one of Erickson's external hard drives. Coblantz found Cook's identification and wallet in the white Buick.

The State charged Cook and codefendant Holly Burkhart with one count of residential burglary. The State also charged Burkhart with one count of theft in the third degree. Burkhart pleaded guilty before trial. The jury found Cook guilty as charged, and the court imposed a standard range sentence of 72 months.

## FAILURE TO OBJECT

Cook contends that he was denied effective assistance when defense counsel failed to object to inadmissible "propensity"[11] evidence. He argues that the evidence violated a pretrial order and effectively informed the jury that he was a suspect in other uncharged burglaries in the neighborhood.

---

[11] Brief of Appellant at 11.

Before trial, the defense moved to exclude evidence that Cook was a suspect in earlier burglaries. Among other things, defense counsel objected to any references to a police "bulletin."[12] Edmonds police had prepared the bulletin in February 2015, about a month before the charged offense, after a rash of home burglaries. The bulletin eventually appeared on the local website for the Richmond Beach neighborhood where the charged offense occurred. The bulletin warned residents to watch out for a white Buick with license number ANK7245. Police arrested Cook after Kelly Szabo saw the white Buick mentioned in the bulletin and called 911.

Defense counsel argued that the prior police investigations into Cook and others created a significant risk of unfair references to prior crimes. Counsel asked the court to limit the testimony to Cook's actions on March 18.

After an extensive colloquy, the court agreed with defense counsel's suggestion that Szabo could testify she called 911 based on "information . . . [to] be on the lookout for this . . . white Buick with a specific license plate,"[13] without any reference to a "bulletin."

The trial court also ruled that the testimony of the responding police officers, who were familiar with the bulletin, should be restricted in a similar

---

[12] Report of Proceedings at 44.
[13] Report of Proceedings at 49.

manner. The deputy prosecutor acknowledged that testimony about the bulletin could "open up a huge can of worms"[14] and informed the court that the State did not intend to elicit testimony about Cook's possible participation in prior burglaries. Defense counsel also suggested that the deputy prosecutor should use leading questions during examination of the officers.

During trial, Detective Souza testified, without objection, that police had information about a white Buick with a specific license plate number, that Sullivan told the police he had just dropped off some friends, and that Sullivan's cell phone rang repeatedly, showing Burkhart's name as the caller. Souza then continued:

> Q. Okay. So we has [sic] stated earlier that you had previously received information about this white Buick, ANK7245. Now, you see this phone ringing. Did you take any action based on that?
> A. We had information that the white Buick that was there, and Holly Burket (sic) along with her boyfriend, Mr. Cook, and his brother, Randy, were associated with that vehicle.
> Q. Okay. So what did you do then?
> A. *Based on the information that we had, previous information, we had suspected that they were somewhere in the neighborhood and a crime was being occurred [sic].*
> Q. Okay. Did you receive any instruction from the Sergeant as to what to do then?
> A. We all—the three of us there put our—kind of put our minds together, and we decided to have the patrol units and the unmarked units, which is us and another detective's—we call it

---

[14] Report of Proceedings at 47.

roaming the area or roving the area to see *if we can locate where they are, where they're coming from, or where they're hiding, or what they're doing.*

    Q.  Okay. When you say roam or rove, maybe it's self-explanatory, but what exactly do you do?

    A.  So not knowing where they are, we'll – we'll fan out in a neighborhood with our patrol vehicles and our unmarked cars in hopes of locating them.[15]

Detective Soderstrom testified that he responded to the 911 call at about

11:45 a.m. The deputy prosecutor then asked about the type of call:

    A.  Patrol guys were out with—or looking for a—a white Buick that *we had information was possibly associated with a burglary.*

    Q.  Okay. Did you respond?

    A.  I did. When I hear our guys go out on—or the patrol officers go out on a call like that, if I'm not doing anything pressing in the office, the detectives will generally go out and assist.[16]

Cook maintains that the highlighted comments violated the pretrial ruling and essentially informed the jury that Cook had committed prior burglaries. He argues that defense counsel's failure to object to the "prejudicial propensity evidence"[17] constituted constitutionally deficient performance.

To prevail on a claim of ineffective assistance of counsel, the defendant must show that counsel's performance fell below an objective standard of

---

[15] Report of Proceedings at 320-21 (emphasis added).
[16] Report of Proceedings at 378-79 (emphasis added).
[17] Brief of Appellant at 11.

reasonableness and that the deficient performance prejudiced the outcome of the trial. Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. McFarland, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). There is a strong presumption that counsel provided effective representation, and we accord "exceptional deference" to counsel's strategic decisions. State v. McNeal, 145 Wn.2d 352, 362, 37 P.3d 280 (2002). The defendant bears the burden of demonstrating the absence of any legitimate tactical or strategic decision. State v. Grier, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011), cert. denied, 135 S. Ct. 153 (2014). We review claims of ineffective assistance de novo. State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

"The decision of when or whether to object is a classic example of trial tactics." State v. Madison, 53 Wn. App. 754, 763, 770 P.2d 662, review denied, 113 Wn.2d 1002 (1989). When an ineffective assistance of counsel claim is based on the failure to object, the defendant must show that (1) the failure to object fell below an objective standard of reasonableness, (2) the trial court would have sustained an objection, and (3) the result of the trial would have been different. In re Pers. Restraint of Davis, 152 Wn.2d 647, 714, 101 P.3d 1 (2004). Under certain circumstances, the failure to object may be a reasonable strategy to avoid emphasizing improper or irrelevant testimony. Davis, 152 Wn.2d at 714;

see also State v. Donald, 68 Wn. App. 543, 551, 844 P.2d 447, review denied, 121 Wn.2d 1024 (1993).

Cook contends that the challenged testimony violated the trial court's pretrial ruling and that the court would therefore have sustained defense counsel's objection. But the fact that the trial court would have sustained an objection does not by itself determine the reasonableness of counsel's failure to object. See Davis, 152 Wn.2d at 714.

Defense counsel in this case vigorously and successfully argued against the admission of evidence identifying Cook as a suspect in any prior offenses. During the lengthy pretrial colloquy, defense counsel repeatedly expressed her concern that the trial testimony could become "very messy"[18] because of the scope of the prior police investigation and the presence of multiple suspects. Counsel explained that because of the significant risk of inadmissible evidence, she was attempting to clarify the issues in order to avoid objections during trial:

> I wanted to alert the Court and Counsel to the issues that I see because, when we get into trial, the actual testimony, it's going to be very awkward.
>     . . . .
>     . . . And I don't want the Court or Counsel to hear my objection right there, so that we have to take time out of the presence of the jury, back and forth, back and forth.

---

[18] Report of Proceedings at 27.

Counsel also hoped "to keep things tidy and clean . . . [and to] minimize sidebars, excessive objections, confusion, et cetera."[19]

The unchallenged evidence before the jury established that the police had prior information about the Buick and that the Buick was associated with multiple persons, including Cook. Viewed in context, the challenged testimony refers only vaguely to the existence of prior uncharged crimes. Nor did the officers provide any specific details identifying Cook as a suspect in prior burglaries or any further information about the events that led to the police bulletin. The challenged comments were brief and isolated, and both officers immediately moved on to unchallenged testimony about Cook's arrest. The State presented no further testimony or argument that might have suggested Cook's involvement with prior crimes.

Given the attenuated and isolated nature of the comments, defense counsel could reasonably have decided not to object in order to avoid emphasizing the testimony and to minimize any additional speculation about the underlying circumstances. Because the decision not to object was a legitimate trial strategy, defense counsel's performance was not deficient.

---

[19] Report of Proceedings at 28-29.

## APPELLATE COSTS

Cook asks this court to exercise its discretion and not impose appellate costs. See State v. Sinclair, 192 Wn. App. 380, 385-86, 367 P.3d 612, review denied, 185 Wn.2d 1034 (2016). The State does not address Sinclair and contends only that the record contains insufficient information to determine Cook's future ability to pay. After considering the nonexclusive factors addressed in Sinclair, including the length of Cook's sentence, the trial court's waiver of all nondiscretionary legal financial obligations, and Cook's continuing indigence, we exercise our discretion and do not assess appellate costs against Cook.

Affirmed.

Becker, J.

WE CONCUR: